RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0050p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

ROBERT PARKER; PAUL ADAMS,

        *Plaintiffs-Appellees*,

   *v.*

BATTLE CREEK PIZZA, INC.; KEVIN HERSHOCK; DOE
CORPORATIONS 1–10; JOHN DOES 1–10,

        *Defendants-Appellants*.

⎤
⎥
⎥
⎥
⎥   No. 22-2119
⎥
⎥
⎥
⎦


MICHAEL BRADFORD, on behalf of himself and those
similarly situated,

        *Plaintiff-Appellant*,

   *v.*

TEAM PIZZA, INC.; CHRIS SHORT,

        *Defendants-Appellees*.

⎤
⎥
⎥
⎥
⎥   No. 22-3561
⎥
⎥
⎥
⎥
⎦

Appeals from the

United States District Court for the Western District of Michigan at Grand Rapids;
No. 1:20-cv-00277—Janet T. Neff, District Judge.

and

United States District Court for the Southern District of Ohio at Cincinnati;
No. 1:20-cv-00060—Michael R. Barrett, District Judge.

Argued:  October 18, 2023

Decided and Filed:  March 12, 2024

Before:  CLAY, KETHLEDGE, and MATHIS, Circuit Judges.

—————————

**COUNSEL**

**ARGUED:** Jeffrey C. Gerish, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants in 22-2119. Matthew W.H. Wessler, GUPTA WESSLER PLLC, Washington, D.C., for Appellees in 22-2119 and for Appellant in 22-3561. Lauren S. Kuley, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, for Appellees in 22-3561. **ON BRIEF:** Jeffrey C. Gerish, Patrick C. Lannen, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellants in 22-2119. Matthew W.H. Wessler, Linnet Davis-Stermitz, GUPTA WESSLER PLLC, Washington, D.C., Jessica Garland, GUPTA WESSLER PLLC, San Francisco, California, Andrew Kimble, Laura Farmwald, Emily Hubbard, BILLER & KIMBLE, LLC, Cincinnati, Ohio, Andrew Biller, BILLER & KIMBLE, Columbus, Ohio, for Appellees in 22-2119 and for Appellant in 22-3561. Lauren S. Kuley, Shams H. Hirji, Ellen H. Phillips, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio, Kathleen McLeod Caminiti, FISHER & PHILLIPS, LLP, Murray Hill, New Jersey, J. Hagood Tighe, Matthew R. Korn, FISHER & PHILLIPS, Columbia, South Carolina, for Appellees in 22-3561. Christopher J. Walker, UNIVERSITY OF MICHIGAN LAW SCHOOL, Ann Arbor, Michigan, Todd Lundell, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Costa Mesa, California, Nora K. Stilestein, Emily A. Papania, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Los Angeles, California, for Amici Curiae in 22-3561.

—————————

**OPINION**

—————————

KETHLEDGE, Circuit Judge. These are two consolidated appeals—one from the Western District of Michigan, the other from the Southern District of Ohio—in which the parties disagree about how pizza-delivery drivers should be reimbursed for the cost of providing their vehicles for work. The Michigan court agreed with the plaintiffs (the delivery drivers) that they should be reimbursed using a mileage rate published by the IRS; the Ohio court agreed with the defendants (the drivers' employers) that a "reasonable approximation" of the drivers' costs will do. We respectfully disagree with both courts and vacate their decisions.

I.

Subject to certain exemptions not relevant here, the Fair Labor Standards Act (FLSA) requires employers to pay "each" employee a wage of "not less than" $7.25 an hour. 29 U.S.C. § 206(a)(1)(C). An applicable regulation, in turn, provides that each employee's minimum

wages must be "paid finally and unconditionally or 'free and clear'" of any "'kick-back'" to the employer. 29 C.F.R. § 531.35. That regulation articulates the clear implications of the statute itself, like a judicial holding would. The same regulation further provides that, if an employer requires an employee to "provide tools of the trade" for purposes of "the performance of the employer's particular work," the employer violates the Act if "the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid to him under the Act." *Id.* Thus, if an employer requires a minimum-wage employee to provide his own "tools" for work, the employer must reimburse him for 100% of the cost of doing so.

That is what the plaintiffs allege the defendants failed to do here. Each of the three plaintiffs—Michael Bradford, Robert Parker, and Paul Adams—was a pizza-delivery driver for one of the two defendants—Battle Creek Pizza and Team Pizza, the latter a Domino's franchisee. During the period at issue here (approximately 2017-2020), the defendants respectively paid each plaintiff a wage of $7.25—the statutory minimum—minus a "tip credit." *See generally* 29 C.F.R. § 531.50. The defendants also required each plaintiff to provide the "tools of the trade" for delivering pizzas, namely their own vehicles. That caused each plaintiff to incur substantial expenses—for gas, maintenance, insurance, and so on, along with depreciation. As reimbursement, Team Pizza paid Bradford $0.28 per mile driven on deliveries, while Battle Creek Pizza paid Parker and Adams $1.00 or $1.50 per delivery, depending on the timeframe.

The plaintiffs (represented by the same law firm in each case) say those reimbursements fell short of the plaintiffs' expenses—thereby cutting into their statutory minimum wages. Instead, the plaintiffs say, the defendants should have reimbursed them using the IRS standard-mileage rate for business deductions, which for 2018 was $0.54 per mile. The defendants counter that reimbursement in the amount of a "reasonable approximation" of the plaintiffs' expenses is enough, as a matter of law, to comply with the Act. The district court in Parker and Adams's case agreed with the plaintiffs; the court in Bradford's case agreed with the defendants; and each court certified its decision for interlocutory appeal. We granted the parties' petitions for review.

II.

We review the district courts' statutory and regulatory interpretations de novo.  *RL BB Acquisition, LLC v. Bridgemill Commons Dev. Grp., LLC*, 754 F.3d 380, 384 (6th Cir. 2014).

A.

The defendants' position in both cases is that an employer's "reasonable approximation" of a delivery driver's cost of providing his vehicle is always—as a matter of law—sufficient reimbursement for purposes of paying his minimum wages.  That is so, the defendants insist, regardless of whether that "reasonable approximation" in fact fully reimburses a particular minimum-wage driver for his actual costs.  In support, the defendants offer some complicated arguments to the effect that various provisions—some of them regulatory—allow us to "infer" that a reasonable approximation of a driver's costs is enough, in every case, to avoid cutting into the driver's minimum wages.  By contrast, the Act is Occam's Razor:  it says that an employee is entitled to the minimum wage specified therein—period.  29 U.S.C. § 206(a)(1)(C).  But we address the defendants' arguments on their own terms.

The defendants' principal argument is that a daisy chain of regulations supports their conclusion that—to satisfy their minimum-wage obligations under the Act—they can reimburse their drivers whatever the defendants themselves determine to be a reasonable approximation of the drivers' costs.  By way of background, the Act provides (again subject to certain exemptions) that employers must pay each employee not only a minimum wage, but also an overtime rate— for work hours in excess of 40 hours in a particular workweek—of "not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(2).  The employee's "regular rate" is the hourly wage he is usually paid.  Calculating that rate can be complicated when an employer reimburses an employee for various costs—say, travel expenses—that he incurs as a result of his work.  For then the employee receives various kinds of payments from the employer, only some of which count toward his regular rate.

The defendants' chain of regulations begins with § 531.35, which (as noted above) bars an employer from receiving any "kick-back" of minimum wages paid to any employee (of which

underpayment of an employee's cost of providing tools is an example).  Section 531.35 ends by saying, "[s]ee also in this connection, § 531.32(c)."  The latter provision, in turn, more generally provides that—when an employer pays for "facilities" that primarily benefit the employer (like "miner's lamps")—those payments are not "included in computing [an employee's] wages." Taking these two provisions together, then, an employer must reimburse an employee for any costs she bears for the employer's benefit (at least to the extent necessary to avoid underpayment of the employee's minimum wage); and expenditures primarily for the employer's benefit do not count toward payment of the employee's wages.  With those propositions, everyone here agrees.

The disagreement begins with § 778.217, which § 531.32(c) tells the reader to "see" for further "discussion of reimbursement of expenses[.]"  Section 778.217 falls within a different "subchapter" of the Act's regulations than the § 531 provisions do—because § 778.217 deals exclusively with overtime compensation under § 207 of the Act, whereas the § 531 provisions deal primarily with wage payments under § 206.  Section 778.217 addresses when an employer's reimbursements of an employee's expenses count toward the employee's "regular rate" for purposes of computing overtime.  The effect of this provision is to avoid unfairly inflating or deflating an employee's regular rate for purposes of overtime pay.  Specifically, § 778.217 excludes from the computation of the employee's regular rate the employer's reasonable reimbursements of costs incurred by the employee on the employer's behalf.  For example, if the defendants' reimbursements of their delivery drivers' vehicle costs were included in the drivers' "regular rate," their overtime wages—which are 150% of their regular rate—would be unfairly inflated.  Section 778.217 strips out those reimbursements from the employee's regular rate and thus prevents that inflation.  Conversely, § 778.217 prevents an employer from deflating an employee's regular rate by disguising wages as reimbursements.  For example, an employer might lower an employee's hourly wage while overpaying for reimbursements.  That would artificially reduce the employee's regular rate and thus his overtime pay.  Section 778.217 therefore provides that, "[i]f the amount paid as 'reimbursement' is disproportionately large, the excess amount will be included in the [employee's] regular rate."  29 C.F.R. § 778.217(c)(1).

Thus, for purposes of computing an employee's overtime wages, § 778.217 makes a distinction between reasonable reimbursements and excessive ones.  That distinction is what the

defendants flag here.  Specifically, § 778.217 provides that an employer's reimbursement of "the actual or reasonably approximate amount" of certain employee expenses—like the cost of purchasing or laundering uniforms, or certain travel expenses—"will not be regarded as part of the employee's regular rate[.]"  *Id*. § 778.217(b)(2), (3).  From that exclusion, the defendants infer that "the Department would deem a reasonable approximation of costs (and not just actual costs) sufficient reimbursement for employer-benefitting expenditures *under the FLSA*."  Team Pizza Br. at 23 (emphasis added).  That is quite the inferential leap:  the defendants would expand the scope of the reasonable-approximation rule to apply not only to overtime computations—which is what § 778.217 applies to—but also to *any* computation of wages "under the FLSA."  And that would include, ultimately, computations of the amounts the defendants must reimburse their delivery drivers for their vehicle costs.

We reject the defendants' inference for several reasons.  First, § 778.217 does not even apply the reasonable-approximation rule to all computations of overtime pay.  And indeed § 778.217 does not even apply that rule to *reimbursement for tools*.  Specifically, § 778.217(b)(1) says that "*[t]he actual amount*"—and not some reasonable approximation thereof—"expended by an employee in purchasing . . . *tools*" will "not be regarded as part of the employee's regular rate[.]"  *Id*. § 778.217(b)(1) (emphasis added).  The defendants would have us apply statute-wide, therefore, a rule that the Department chose not to apply—even in the overtime context—to the type of reimbursement at issue here.

Moreover, there are good reasons not to expand the reasonable-approximation rule to minimum-wage computations.  As noted above, § 778.217 addresses only computations for the purpose of calculating overtime pay.  And for that purpose, a reimbursement that falls short of the employee's actual costs would not reduce her overtime pay.  For in that event, the amount deducted from her regular rate would be the same amount as the reimbursement (which by definition would not be excessive).  That would leave her regular rate unchanged from her hourly wage.  So as far as overtime is concerned, therefore, the underpayment would result in no violation of the Act.  (Conceivably an underpayment of an employee's costs could increase the employee's regular rate, thereby increasing her overtime pay.  But that increase would not violate the Act—it prescribes floors, not ceilings—and we need not get into those details here.)

By contrast—when determining whether a minimum-wage employee has been paid her minimum wages—a "reasonable approximation" that amounts to an underpayment of an employee's cost of providing tools most certainly *would* result in a violation of the Act. Indeed, it would violate the very provision at issue here: namely, § 206(a)(1)(C). For when (as here) an employee's hourly wage is the bare minimum wage, *any* underpayment of her cost of providing tools will cut into her minimum wages. That is true to a mathematical certainty—which is why § 531.35 says what it says about the cost of tools "cut[ting] into" minimum wages. Application of the "reasonable-approximation" rule to minimum-wage calculations, therefore, opens the door to FLSA violations in a way that application of that rule to overtime calculations does not. That is reason enough to reject the defendants' inference.

Yet the defendants likewise argue that § 207 of the Act supports the same inference. That argument fails for essentially the reasons just stated. Section 207 is likewise an overtime provision. Section 207(e) excludes from an employee's regular rate an employer's "reasonable payments" to the employee for expenses that she incurs for the employer's benefit. Section 207(e) thereby prevents inflation of an employee's regular rate based on those "reasonable" reimbursements. (The implication—spelled out expressly in 29 C.F.R. § 778.217(c)(1), as noted above—is that reimbursements *do* count toward the employee's regular rate to the extent they are "excess[ive.]") Section 207(h) in turn provides that "sums excluded from the regular rate pursuant to subsection (e) shall not be creditable toward wages required under section 206 of this title or overtime compensation required under this section." Based on these two provisions, the defendants then assert that the Act itself shows that a reasonable-approximation rule "applies with equal force in the minimum-wage context." Team Pizza Br. at 36.

But again the defendants infer too much. Section 207(e) and (h) together simply provide that amounts treated as *reimbursements* for purposes of determining the employee's regular rate do not count as *wages* for purposes of determining whether the employer has paid the minimum and overtime wages required under the Act. That hardly means that a reasonable-approximation rule should apply to every computation made for purposes of determining whether an employee has received her minimum wages. Quite the contrary: doing so would open the door to violations of § 206(a)(1)(C), as shown above. And one can do everything that § 207(e) and (h)

prescribe—namely, exclude a reasonable-approximation reimbursement from the computation of an employee's regular rate and from her wages alike—and still conclude that the reimbursement effects an unlawful kickback to the employer to the extent it falls short of the costs that a minimum-wage employee actually incurs on her employer's behalf. The Act and its regulations describe the employer's minimum-wage obligations in straightforward, concrete terms; the inferences the defendants seek to draw from the Act's overtime provisions, by contrast, end up in knots.

We more briefly address the defendants' remaining two arguments. One is based on a 2020 "opinion letter" from the Department of Labor, to which they suggest we should afford *Skidmore* deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). But the letter more briefly presents the same arguments we reject above, so we do not find it persuasive. Moreover—like the defendants themselves—the 2020 letter never grapples with the situation the plaintiffs allege to be present here: that the employer's approximation (reasonable or not) of a minimum-wage employee's costs falls short of the actual costs she incurred on her employer's behalf. That is a problem that the defendants' theories do not solve or even acknowledge.

Finally, the defendants insist that computing their drivers' actual costs of providing vehicles for their work would be "impossible." But the employers themselves created this situation: first by paying their drivers the bare minimum wage; then by requiring them to provide their own vehicles to deliver pizzas on the defendants' behalf; and finally by cutting it close (at least according to the allegations here) as to whether they have adequately reimbursed their drivers for the cost of providing those vehicles. Remove any of those elements and these cases likely do not get filed. Of course, no legal rule bars employers from making pizza-delivery drivers provide their own vehicles, and the defendants have greater knowledge than we do about any efficiencies that might create. But the risk of financial harm from borderline reimbursements—the risk, specifically, that even "reasonably approximate" reimbursements might be inadequate ones for some employees—must fall solely on the employer. No less a jurist than Henry Friendly wrote that an employer's obligation to pay wages mandated by the FLSA is "absolute." *Caserta v. Home Lines Agency, Inc.*, 273 F.2d 943, 946 (2d Cir. 1959). And § 206(a)(1)(C) specifies—to the penny—the minimum wage that an employer must pay

"each" of its employees.  An employer must therefore pay each employee at least that amount, not a "reasonable approximation" thereof.

B.

Yet the Act's specificity cuts both ways.  For the plaintiffs too want to use an approximation—albeit a more generous one—for reimbursement of their vehicle costs. Specifically, the plaintiffs say they should be reimbursed using the IRS's standard-mileage rate for business deductions.  But that rate is a nationwide average, which tends to overpay drivers in states where gas taxes are relatively low (like Ohio) and underpay drivers where gas taxes are high (like California).  In addition, the estimation of depreciation costs in the IRS rate is weighted toward newer vehicles, which tends to overpay drivers of older vehicles.  Moreover, some vehicle models (like the Toyota Tacoma) depreciate more slowly than other models do. And of course some vehicles get better gas mileage than others.  The IRS rate also favors low-mileage drivers and disfavors high-mileage ones, like delivery drivers; according to one expert commentator, "businesses that rely on the IRS rate to reimburse mid- and high-mileage workers are likely providing reimbursements that do not reflect actual driving costs." *Vehicle Ownership and Operating Cost Analyses Reveals Inflation, Fuel Prices, and Acquisition Costs Underpin New Mileage Rate*, Motus, *available at* https://www.motus.com/blog/2024-irs-business-mileage-rate/ (last visited Mar. 11, 2024).

Thus, the IRS rate does not even purport to measure the vehicle costs of any individual employee.  Indeed, if the IRS rate were conscripted to estimate those costs, it would nearly always estimate them wrongly.  Not even the plaintiffs contend otherwise.  Meanwhile, as noted above, § 206(a)(1)(C) mandates that "each" employee be paid at least the specified minimum wage.  By its terms, that is an individual entitlement, not a generalized collective one.  And that entitlement extends no further than reimbursement of the employee's actual costs incurred on his employer's behalf.  The question, then, is how we would have any legal basis to mandate—in every case—a nationwide-average reimbursement that does even purport to measure an individual employee's actual costs.

The plaintiffs answer that a federal agency has mandated the IRS rate and that we must therefore do the same. But neither of those premises survives much scrutiny. As noted above, 29 C.F.R. § 531.35 provides that—to the extent necessary to avoid cutting into an employee's minimum wages—the employee must be reimbursed for "the cost" of providing tools for his work. The regulation does not describe how to calculate those costs, and calculating them in the case of delivery drivers can be hard. Hence, the plaintiffs say, § 531.35 is "ambiguous" as to how to make the necessary calculations here. And that putative ambiguity is resolved, they assert, by a Department of Labor "Field Operations Handbook"—a document that itself expressly disclaims any interpretive purpose—which says the IRS rate "may be used (in lieu of actual costs and associated recordkeeping) for FLSA purposes." Field Operations Handbook § 30c15, Department of Labor, *available at* https://www.dol.gov/agencies/whd/field-operations-handbook. Thus, the plaintiffs conclude, we must defer to the Handbook and the defendants must use the IRS rate to reimburse their drivers.

But the plaintiffs confuse the interpretation of a legal rule with its application to particular facts. Specifically, to show that § 531.35 is ambiguous, the plaintiffs must identify some uncertainty about its meaning. The plurality opinion cited by the plaintiffs says as much: ambiguity arises when a court faces "real uncertainties about a regulation's *meaning*." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2410 (2019) (plurality opinion) (emphasis added). Even the plaintiffs themselves say that various terms in other regulations—like "comparable," "in connection with," or "two occupations"—are ambiguous because of uncertainty about what those terms "might mean." Bradford Br. at 23-24.

But here the plaintiffs admit that the text of § 531.35 is "crystal clear." Bradford Br. at 26. Indeed, nobody in these appeals disputes that "cost" means the expenses (or diminution in value) that an employee incurs in providing tools for his work. Indeed, both sides have argued this case in precisely those terms. Moreover, nobody disagrees about the particular expenses that the term "cost" comprises here: namely, the plaintiffs' expenses for gas, maintenance, insurance, and so on, along with depreciation. What *is* difficult, as the plaintiffs point out, is calculating those expenses for a particular delivery driver. But that is not because of any ambiguity in the

regulation. That calculation is difficult, rather, because the information necessary to make that calculation can be difficult or tedious to obtain.

Ambiguity goes to meaning, *Kisor*, 139 S. Ct. at 2410; whereas the calculation here involves the application of a known meaning—of "cost," and what cost comprises here—to a particular set of facts. That those facts are hard to gather does not make the regulation ambiguous. The phrase "population of the United States," for example, is not ambiguous simply because that specific number is hard to ascertain at any particular point in time. Neither is "cost" ambiguous as used in § 531.35. That is reason enough to reject the plaintiffs' argument.

A second reason to reject that argument is that the "Field Operations Handbook" is plainly not entitled to interpretive deference. In *Kisor*, the Supreme Court said that courts should defer to an agency's "authoritative" interpretation of a genuinely ambiguous regulation. 139 S. Ct. at 2414. But here the Handbook offers no interpretation at all. To the contrary, the Handbook says—on its very first page—that it should *not* be "used as a device for establishing interpretive policy." And the provision (if one can call it that) on which the plaintiffs rely says that, "*[a]s an enforcement policy*, the IRS *standard business mileage rate* may be used" in lieu of a determination of an employee's actual costs. *Id*. at § 30c15(a) (emphasis in original).

"Enforcement policies" guide the exercise of prosecutorial discretion; interpretations of legal texts, by contrast, explain not only what the words mean but *why*. The two functions are related only as first cousins are. And here the Handbook offers not a single word of analysis about the meaning of § 531.35's text. Indeed, the provision that the plaintiffs cite does not even mention § 531.35—which is the regulation (according to the plaintiffs) the Handbook purportedly interprets. Truly, arguments like these "debase the coinage of agency deference." *Meister v. U.S. Dep't of Agric.*, 623 F.3d 363, 373 (6th Cir. 2010) (brackets omitted).

In this case, we have neither an ambiguity nor even an interpretation to which we could possibly defer. That leaves us to do what courts do in most cases, which is to apply the statute (and here an applicable regulation) by their terms. And that means that neither side's one-size-fits-all approximation of an employee's costs is binding upon the other side.

C.

All that said, the facts of this case present a dilemma. The statute entitles a minimum-wage employee to reimbursement of his actual costs incurred on his employer's behalf. But the statute requires neither more nor less than that. And here those costs are undisputedly hard to calculate. Meanwhile, as in most cases, the plaintiff in FLSA cases bears the burden of proof. That combination of circumstances might allow employers to use lowball estimates of drivers' costs and then leave it to them to prove those estimates wrong.

Yet the Supreme Court has already reversed our court once (albeit long ago) for a "standard of proof that ha[d] the practical effect of impairing many of the benefits of the Fair Labor Standards Act." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686 (1946). And so in *Anderson*—based on the employer's failure to keep certain records—the Court chose to lighten somewhat the plaintiffs' burden of proof. *Id*. at 687. As a practical matter, the situation here likewise threatens to impair the benefits of § 206(a)(1)(C) of the Act. We do not fault the defendants for any failure of recordkeeping; but the situation here, as noted above, is one that they chose to create.

Here, the difficulty of proof is arguably similar to that in Title VII cases where a plaintiff alleges unlawful discrimination. In those cases, direct evidence of discriminatory intent is usually hard to come by. Thus, in Title VII cases, plaintiffs often rely on indirect evidence of discriminatory intent. In such cases the Supreme Court has prescribed a burden-shifting regime: first, the plaintiff must establish a prima facie case of discrimination; then the burden shifts to the employer to articulate a legitimate reason for its decision; and finally the burden shifts back to the employee to prove that the employer's reason was pretextual. *See, e.g.*, *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 213 (2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

Perhaps a similar regime might address the evidentiary problem here. For example, the employee might present prima facie proof that a reimbursement was inadequate; the employer might then bear the burden of showing that the reimbursement bore a demonstrable relationship to the employee's actual costs, *cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 431-32 (1971);

and then the employee would bear the burden of proving the employer's reasoning wrong. Or perhaps such an arrangement might not be appropriate. In any event, the parties and the district courts might want to consider these or other ideas on remand.

\*          \*          \*

We vacate the district courts' orders and remand for further proceedings consistent with this opinion.